UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN R. DEGRAVE, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No: 04 C 8147 |
| NATIONAL AUTOMATIC MERCHANDISING ASSOCIATION, | ) ) ) | Judge John W. Darrah |
| Defendant. | ) ) | |

## OPINION AND ORDER

Plaintiff, Steven R. DeGrave, filed suit against Defendant, the National Automatic Merchandising Association ("NAMA"), alleging a violation of Section 510 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140.

This matter now comes before the Court following the presentation of evidence during a bench trial. The Court has considered the evidence, including the testimony of witnesses and exhibits, and has further considered the written arguments of counsel for the parties and the authority cited therein. The Court weighed the testimony of each witness and determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity the witness had to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. §§ 1.13, 1.21 (2005).

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following Findings of Fact and Conclusions of Law based upon consideration of all admissible evidence and the Court's assessment of the credibility of the witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact.

## **FINDINGS OF FACT**

DeGrave, born February 17, 1951, was employed as an at-will employee from April 3, 2000, through March 5, 2005, by NAMA. NAMA is a national trade association of merchandising, vending, coffee and contract food service management industries. NAMA is a tax-empt organization under Section 501(c)(6) of the Internal Revenue Code of 1986.

NAMA is the plan sponsor of the National Automatic Merchandising Association Pension Plan (the "Plan"). The Plan provides defined benefit pension payments and benefits to eligible NAMA employees. The Plan does not allow for any contributions from employees and is 100 percent funded by NAMA. Deloitte Consulting is the Plan's actuary.

Beginning January 1, 1999, Richard Geerdes has served as the President and Chief Executive Officer of NAMA. Geerdes reported to the Chairman of the Board of the NAMA Board of Directors (the "Board"). Geerdes is not a member of the Board but does act as secretary to the Executive Committee of the Board. Geerdes also has the responsibility of preparing or causing to be prepared the materials and issues considered by the Board's respective committees. If another staff member prepares the materials to be considered by the Board, Geerdes reviews those materials prior to their submission to the Board.

Geerdes, Dan Mathews, Patrick Caffarelli (NAMA's Chief Financial Officer), and Jan Corban (the Director of Human Resources) served on NAMA's internal senior staff pension management team. Mathews was employed at NAMA, beginning January 11, 1999, as Vice President of Membership. In February 2001, Mathews assumed the position of Senior Vice President and Chief Operations Officer of NAMA. Throughout DeGrave's employment at NAMA, DeGrave reported directly to Mathews, and Mathews reported directly to Geerdes.

In a letter dated March 17, 2000, NAMA, through Geerdes, offered DeGrave employment with NAMA as Vice President of Sales and Service. During the interview process, DeGrave, Mathews and Geerdes discussed the NAMA pension plan as a significant benefit and that a person vests in the plan after five years of employment.

DeGrave began his employment with NAMA on April 3, 2000. DeGrave's responsibilities included developing sales, increasing revenues, retention and expansion of NAMA's membership, being involved in NAMA's annual trade show, and managing the Fair Share and Affinity Partners programs. DeGrave was also responsible for the expansion and development of the office-coffee service business component of NAMA, including the hiring of a director of office-coffee service.

In March 2001, DeGrave received his annual written performance appraisal. DeGrave's overall evaluation rating, based on the average of ten categories, was 3.6 out of 5. A three indicates that the employee "consistently meets expectations"; a four indicates that the employee "consistently meets all expectations and occasionally exceeds them"; and a five indicates that the employee "consistently exceeds expectations." Comments on DeGrave's work included the need to take a more participatory role in meetings, improving full-year membership projections, and increasing his

visibility at expositions. In May 2001, DeGrave received a "Certificate of High Achievement" for leadership development. The certificate was signed by Geerdes and Mathews.

On November 7, 2001, DeGrave received a written warning from Mathews. The written warning stated that the events that occurred the previous day were "troubling and cannot recur." The events referred to included: (1) State Council reimbursement checks being mailed with a cover letter from Geerdes, (2) membership renewal packets mailed without the normal review process, and (3) a challenge/defiance by DeGrave of Mathews' authority in a meeting.

In April 2002, DeGrave received his annual written performance evaluation. DeGrave's overall evaluation rating was 3.4. The lowest evaluation DeGrave received was a 2.5 for "job attitude." The comment for that section stated "'managing up' could be improved – I appreciate the progress that has been made." This evaluation also noted that membership projections could be improved. On June 12, 2002, Geerdes issued a memorandum to the NAMA staff, announcing that DeGrave would assume the responsibility as NAMA's International Liason. Mathews had previously recommended that DeGrave assume these duties.

In April 2003, DeGrave received his annual performance evaluation. DeGrave's overall evaluation rating was 3.6. This evaluation included a comment that DeGrave needed to improve membership retention. Dues revenues increased 4.5 percent in 2003 as compared to 2002. In December 2003, DeGrave participated as a member of the inaugural class for a new professional designation, NAMA Certified Executive ("NCE"), for which DeGrave received his NCE designation certificate.

DeGrave did not know how his overall evaluation rating compared with other NAMA employees. Of the five employees that reported directly to Mathews, DeGrave's overall performance

rating was "at the low end." Larry Eils and Stuart Aizenberg, who also reported to Mathews, had overall performance ratings of 3.65. Mathews rarely gave an individual rating less than 3.3 and rarely more than a 4.3.

DeGrave was unaware of any issues relating to his work performance and believes that he was meeting or exceeding Geerdes' and Mathews' expectations. In support of his argument that he was meeting Geerdes' and Mathews' expectations, DeGrave offers the following facts: dues revenues increased 4.5 percent in 2003 as compared to 2002; revenues from the Fair Share program increased, and the program was deemed a success[1]; and renewal percentages were 80.7 in 2001, 80.1 in 2002, and 81 in 2003. DeGrave received merit increases in his salary as follows: 3.5% in 2001, 2.7% in 2002, and 3% in 2003. These increases were within the average increases at NAMA during the relevant times.

In mid 2003, Dean Gilland, who had previously been hired by DeGrave and had previously reported to DeGrave, was promoted to a vice-president, a position that reported directly to Mathews. At this same time, the coffee service responsibilities were transferred from DeGrave to Gilland.

On October 27, 2003, Deloitte provided NAMA with a 2003 Actuarial Report for the Plan. The report indicated that the Plan had approximately a $377,000 contribution underfunding for 2003 and a projected underfunding for 2004 of approximately $311,000. The contribution required to address the 2003 underfunding was an actual cash contribution to the Plan, not a profit and loss statement expense entry; and the contribution could not be deferred, avoided, or remain unpaid. This underfunding was the first required actual cash contribution to the Plan since approximately 1985

---

[1] Geerdes and Mathews agreed that the Fair Share program was a success but attributed the program's success to the team effort of several individuals involved in the program.

5

or 1986. The pension fund shortfall was caused by under-performing fund assets. A couple of days after receiving the report, the NAMA internal senior staff pension management team met to discuss the underfunding and to begin to formulate strategies to address the underfunding, including the immediate involvement of the Finance and Audit Committee of the NAMA Board of Directors. The Finance and Audit Committee was immediately involved in the 2003 underfunding matter because Geerdes recognized that addressing the 2003 underfunding would directly impact the profit and loss ("P & L") statement for NAMA, including developing revenue and expense budgets and projections for 2004.

On October 30, 2003, Geerdes and Caffarelli issued Finance and Audit Committee Letter No. 03.15 to the Board of Directors Committee. Letter No. 03.15 provided the Committee their first notice of the pension underfunding. Letter No. 03.15 proposed paying the 2003 underfunding from NAMA's reserves and for budgeting the 2004 underfunding as quarterly contributions from operations of $100,000 each. Letter No. 03.15 also found that if NAMA did not use reserves to address the underfunding and chose to accrue the 2003 and 2004 contributions over the course of 2004, it would create a burden that would have a negative impact on NAMA. Letter No. 03.15 informed the Committee that, while the pension expense would continue to be included as part of the overall P & L, the actual pension expense would be segregated as a "below the line" expense to NAMA, to allow for the appropriate focus and delineation of the pension expense from the rest of the P & L statement.

On November 24, 2003, Geerdes issued Directors Newsletter No. 03.39, which informed the full Board of Directors of the two major budget issues confronting NAMA: (1) the NAMA national expo, which was held in mid-October 2003, had underperformed, creating an operating budget

deficit of $155,191; and (2) the Deloitte Actuarial Report, which informed NAMA of the 2003 and 2004 pension Plan underfunding. The national expo and pension underfunding deficits jeopardized NAMA's ability to achieve the Board's strategic plan and required senior management to reduce expenses, increase revenues and evaluate operations.

On December 3, 2003, Deloitte made a PowerPoint presentation to NAMA Senior Management, including Geerdes and Mathews, providing a detailed summary of possible alternatives available to address the underfunding issue. The possible alternatives included freezing the Plan, terminating the Plan, improving and enhancing the 401(k) plan, and amending the Plan. On December 8, 2003, Deloitte provided NAMA's Senior Management with an array of tables that projected the Plan's contribution levels for the 2004 Plan Year.

On January 16, 2004, Geerdes conducted an all-staff meeting of employees to communicate NAMA's financial and pension underfunding status. At the meeting, Geerdes discussed a salary freeze for 2004, a reduction in the bonus program funding, a review of the staffing structure, and inquired if any staff members would be interested in working part-time to assist in overall cost reduction.

On February 6, 2004, Mathews sent an e-mail to DeGrave regarding NAMA's webpage of which DeGrave shared responsibility. Mathews wrote that he spoke with someone revising the webpage. Mathews pointed out that the conversation "really only required a 5-minute conversation." Mathews also stated that he believed "we are missing important revenue production opportunities by not updating the front page daily or weekly." Mathews also expressed surprise that the front page of the website did not highlight the spring expo and its related activities.

7

On February 6, 2004, Deloitte provided another presentation to NAMA. In this presentation, Deloitte raised the possibility of NAMA's establishing a non-qualified plan that would cover a "select group of highly compensated or management employees." On February 19, 2004, Geerdes issued Retirement Committee Letter No. 04.3, entitled "Pension Plan Update," to the Board's Retirement Committee. Letter No. 04.3 referenced a Retirement Committee discussion in late January 2004, after which Geerdes directed Deloitte to examine a variety of alternatives centered on freezing the existing Plan and enhancing the 401(k) plan. Letter No. 04.3 included the possibility of a non-qualified pension plan being established that would include "a limited group of senior people (6?)" and keep them whole if the defined benefit plan was frozen.

On February 23, 2004, Mathews met with DeGrave to discuss DeGrave's willingness to reduce his schedule to four days per week. Mathews and DeGrave also met on February 24, 2004. On that day, they discussed a possible one-day reduction in DeGrave's schedule; and Mathews informed DeGrave that DeGrave's job was "in play." DeGrave expressed concern that if his position was eliminated, he expected to be treated fairly, including in relation to his "pension credit." Mathews interpreted DeGrave's reference to "pension credit" as expressing a concern about DeGrave's severance agreement, in that the severance package would include consideration for his pension concerns. Immediately following the meeting with DeGrave, Mathews made a handwritten note to the file concerning the meeting. The note stated that DeGrave had said no to working four days a week and questioned what would "come off his desk." The note also stated that Mathews informed DeGrave, "Results of membership must improve. I know you work hard, but the results don't show it. Must try new things to impact growth and improve retention. Expect you to take more of a leading role in the leadership of NAMA." Mathews believed that DeGrave did a good job

8

with respect to generating revenue but not in increasing membership or membership retention. While an increase in revenues was important, an increase in members and retention was a key function of DeGrave's position.

Following the meeting, Mathews sent an e-mail to Geerdes. Mathews told Geerdes of his meeting with DeGrave and that he informed Degrave that his position was in "jeopardy namely because of budgetary reasons although stellar performance in other areas would have negated the conversation at all." Mathews considered the pension underfunding as a "budgetary reason." On February 26, 2006, DeGrave sent an e-mail to Geerdes and Mathews, expressing his reactions and proposing a response to the budgetary problems facing NAMA. DeGrave offered to take an effective 10 percent reduction for six months and suggested that each of the top five NAMA executives do the same. Mathews did not view DeGrave's response as appropriate.

That last week of February 2004, Mathews informed Geerdes of his decision to terminate DeGrave's employment. Geerdes told Mathews that he had Geerdes' approval to terminate DeGrave's employment. At that time, Geerdes was unaware that by terminating DeGrave's employment, DeGrave would lose his pension benefits.

On March 3, 2004, Mathews informed DeGrave, in person, that his position was being eliminated; and his employment was terminated effective Friday, March 5, 2004. Mathews did not tell DeGrave that DeGrave's performance was a factor or a reason for DeGrave's termination. On March 4, 2004, Mathews issued an e-mail to all NAMA employees, announcing staff changes. The e-mail stated that DeGrave had left NAMA because his position had been terminated and that he would not be replaced. The e-mail also included other related staff reassignments.

9

Mathews characterized DeGrave's performance during his tenure at NAMA as "disappointing" because DeGrave failed to meet Mathews' high expectations. Mathews was disappointed in DeGrave's leadership skills, DeGrave's inability to bring forth new ideas and strategies to enhance NAMA, and the lack of an increase in membership and retention. He also found DeGrave to be argumentative. Mathews included positive comments in DeGrave's reviews because there were things that DeGrave did do well. Mathews did not use performance reviews as a disciplinary tool. Mathews spoke with DeGrave often about his concerns with respect to DeGrave's performance.

Mathews terminated DeGrave's employment because he thought it "was a well-reasoned business decision." Mathews did not overemphasize any performance issues with DeGrave because it was only one factor in his decision. Other factors included economic issues, business issues, other staff changes and "the pension shortfall issue." Mathews denied that DeGrave's vesting status was involved in the decision to terminate his employment. Mathews was not involved and did not have the responsibility of correcting the pension underfunding. It was Mathews' sole decision to terminate DeGrave's employment.

Geerdes believed that DeGrave's strengths included DeGrave's: knowledge of the selling process, industry familiarity, and personal ability in one-on-one sales situations. Geerdes belived DeGrave's deficiencies included DeGrave's tendency to "manage too much in a silo" and lack of executive strategic and creative thinking that would drive NAMA forward. Geerdes shared these observations with Mathews frequently over the term of DeGrave's employment.

On March 1, 2004, Caffarelli received an actuarial analysis from Deloitte that provided the latest projections regarding a frozen defined benefit plan and an enhanced six percent employer contribution/match to the 401(k) plan. DeGrave was included as part of the analysis.

On March 11, 2004, Geerdes issued Retirement Committee Letter No. 04.5, entitled "Pension Plan Recommendations," to the Board's Retirement Committee. Letter 04.5 explained three alternatives for the pension underfunding: (1) freezing the defined plan; (2) establishing a six percent employer 401(k) contribution to a defined contribution plan instead of offering the current defined plan; and (3) establishing a non-qualified plan for the Senior Management. The Senior Management was defined as the top five officers, not including DeGrave. Letter No. 04.5 recommended making no changes to the defined plan and suggested adding the retirement plan issue to a March 17, 2004 conference call. On March 17, 2004, the Retirement Committee met via a conference call. At the meeting, the Retirement Committee voted to make no changes to the Plan for 2004.

Geerdes directed Caffarelli and Joann Gonos to inquire of Winston & Strawn, counsel for the Plan, whether or not DeGrave's service could be bridged to allow him to get from his current four-years' service to the required five years of vesting service required under the Plan or, alternatively, whether DeGrave could receive a distribution from the Plan. Winston & Strawn replied within 24-hours that there were no exceptions to the vesting rule and that no lump sum payment could be made.

As early as 2002, Mathews contemplated reorganization scenarios. In the Fall of 2003, Mathews again considered reorganization within NAMA. In early 2004, Mathews' reorganization scenarios were documented in an organizational chart, entitled "2004 NAMA ORGANIZATION CHART." Mathews did not discuss his reorganization analysis with any members or committee of

the Board. Mathews perceived that his reorganization was directed at generating "operating" savings by eliminating DeGrave's position and was not conceived to directly have any pension plan impact, including an express reduction in the "below-the-line" pension expense. Mathews' reorganization analysis was an exercise to have a plan in place to act on should Mathews decide to effect a reorganization of his department and was not developed with the specific intent of terminating DeGrave. Geerdes was aware of Mathews' reorganization initiatives and also believed that NAMA was "top-heavy" with "too many senior people, too many chiefs, not enough Indians." Geerdes shared his belief that NAMA was "top-heavy" in the summer and early fall of 2003 with the expectation that Mathews would address the issue.

No one at NAMA ever told DeGrave that his employment termination would help solve the pension issues. Geerdes never commissioned an analysis of the impact of terminating a single individual on the funding requirements of the Plan. While employed at NAMA, the pension benefit statements DeGrave received indicated a vesting date of 2004. These pension benefit statements were incorrect as DeGrave's vesting year was 2005. The pension vesting statements were prepared by Deloitte. DeGrave was the only employee terminated at NAMA during the relevant time frame. Gilland absorbed the bulk of DeGrave's functions after DeGrave's termination.

As the Chief Operating Officer, Mathews knew that NAMA's 2003 budget did not provide a fund to pay for pension contributions of $377,000. Mathews knew that the money needed to pay the 2003 underfunding would have to be taken from NAMA's cash reserves and that the cash reserves would have to be replenished at some point in the future. Mathews also knew that NAMA was experiencing an operating loss at the end of 2003. The operating loss was due to a shortfall in revenue at the fall expo, as well as other line items on the P & L statement.

NAMA froze salaries for the year 2004, and those individuals that received increased compensation in 2004 did so because the number of hours they worked had increased.

Mathews was aware that if a Plan participant left NAMA before being vested, the accumulated pension money would essentially be forfeited. However, at the time that he terminated DeGrave's employment, he did not have an understanding of what effect DeGrave's termination would have on the funding obligation of NAMA with respect to the Plan; and he did not take that into consideration in making the decision to terminate DeGrave's employment.

Deloitte never advised anyone at NAMA that the pension underfunding could be addressed by terminating non-vested participants in the Plan. Howard Freidin, the enrolled actuary for NAMA's Plan and NAMA's lead consultant through Deloitte, testified that in his opinion, the impact of one participant being removed from the NAMA Plan would have a negligible impact on the Plan's underfunding. In fact, when determining actuarial assumptions to be applied to a particular client, Freidin did not take into account the level of staffing of the particular company. DeGrave's employment termination did not have an impact on the 2003 and 2004 underfunding and would not affect the Plan until 2005.

## **CONCLUSIONS OF LAW**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332 & 1333, and venue is proper pursuant to 28 U.S.C. § 1391.

Section 510 of ERISA provides, in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140. To recover under Section 510, an employee must show that the employer terminated him with the specific intent to interfere with his ERISA rights. *See Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131, 135 (7th Cir. 1997) (*Salus*). A violation does not arise if the deprivation was merely a consequence of a decision that had the incidental effect of affecting the employee's benefits. *See Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005) (*Isbell*).

Plaintiff's burden in a Section 510 claim may be satisfied by presenting direct evidence of interference with an employee's protected benefits or by utilizing the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Salus*, 104 F.3d at 135. A *prima facie* case of interference is demonstrated under the burden-shifting method by showing that the employee (1) belongs to the protected class, (2) was qualified for his position, and (3) was discharged under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. *See Salus*, 104 F.3d at 135. If the plaintiff establishes a *prima facie* case of interference, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the employment action. *See Salus*, 104 F.3d at 135. If the employer presents a legitimate reason, the burden then shifts back to the plaintiff to demonstrate that the proffered reason is pretextual and that the motivating factor was the specific intent to interfere with the plaintiff's ERISA rights. *See Salus*, 104 F.3d at 135. A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995).

## **DECISION**

DeGrave argues that he has met his burden under the direct method of proof by demonstrating NAMA's specific intent to interfere with his pension benefits through a "convincing mosaic of circumstantial evidence." In essence, DeGrave's direct method argument is based on the timing of DeGrave's termination and NAMA's learning that the pension was underfunded: (1) Geerdes learned of the pension problem in October 2003; (2) Geerdes diligently attempted to address the issue and discussed the underfunding issue with certain NAMA employees, including Mathews, DeGrave's supervisor; (3) Mathews informed Geerdes that he was going to terminate DeGrave's employment in late February 2003; (4) Geerdes allowed Mathews to terminate DeGrave with knowledge that, by doing so, the pension problem would be mitigated; and (5) DeGrave's employment was terminated in early March 2004.

DeGrave has failed to establish through circumstantial evidence that he was terminated with the specific intent to interfere with his vesting in the Plan. Rather, the evidence establishes that Geerdes' actions, after learning of the pension underfunding, were a reasonable response to the problem as chief executive officer. Moreover, the evidence at trial demonstrated that it was Mathews' decision, alone, to terminate DeGrave based solely on Mathews' belief that a reorganization would reduce NAMA's operating costs, including the increasing pension costs, and Mathews' disappointment with DeGrave's employment performance. DeGrave's performance appraisals throughout his tenure evidenced that DeGrave's performance of his employment responsibilities was, on average, at or slightly below the performance of other NAMA employees. One performance review reflected Mathews' specific dissatisfaction with DeGrave's performance long before the pension underfunding was discovered . Mathews credibly testified that DeGrave

performed well in some areas, but he (Mathews) found that, overall, DeGrave's performance was "disappointing." In addition, Mathews, who made the decision to terminate DeGrave's employment, did not have any responsibility regarding the pension underfunding and was not part of the Finance and Audit Committee that was responsible for resolving the problem.

Significantly, DeGrave and Geerdes both testified credibly that they did not know what effect DeGrave's termination would have on the pension underfunding and that the pension underfunding was not a consideration in the decision to terminate DeGrave's employment. There was evidence that neither Geerdes nor Mathews attempted to determine if DeGrave's termination would favorably impact the underfunding or remedy the pension problem. Howard Freidin, the actuary for the Plan, testified that no one at NAMA inquired as to the effect on the Plan if an employee participant was terminated and that DeGrave's termination would have had a negligible impact on the 2003 and 2004 underfunding. It is also undisputed that immediately after DeGrave's termination, Geerdes caused an inquiry to be made of NAMA's attorney if the five-year vesting requirement could be bridged or otherwise avoided to allow DeGrave to receive a distribution from the Plan.

Based on the above, DeGrave has failed to prove through circumstantial evidence that his employment was terminated with the specific intent to interfere with his ERISA rights.

DeGrave also argues that he has met his burden under the indirect method of proof. DeGrave has demonstrated that he belongs to the protected class, he was qualified for his position, and that he was discharged under circumstances that provide some basis for believing that the prohibited intent to retaliate was present. Thus, DeGrave argues that NAMA's proffered reason for his termination is a pretext and that the motivating factor was the specific intent to interfere with his ERISA rights. However, as discussed above, NAMA presented substantial evidence of a legitimate,

non-discriminatory reason for DeGrave's termination – inadequate performance and the need to reorganize to achieve overall cost savings.

DeGrave identifies certain actions by Mathews and Geerdes that he argues evidence that the proffered reasons for his termination were pretextual. First, DeGrave takes issue with Mathews' and Geerdes' testimony that DeGrave's performance was unsatisfactory. As discussed above, the evidence established that Mathews and Geerdes believed that DeGrave had some strengths but that they also found he was deficient in the performance of important employment responsibilities. DeGrave's performance appraisals support Mathews' and Geerdes' testimony, including both positive comments and negative evaluations and instruction on areas that required improvement. The evidence established that Mathews was, overall, disappointed in DeGrave's performance and that DeGrave failed to meet Mathews' expectations – specifically, in DeGrave's leadership skills, his inability to raise and develop new ideas and strategies, and the relatively flat membership and declining membership retention rate.

DeGrave also argues that Gilland's promotion in mid-2003 from a director to vice-president is contrary to Geerdes' testimony that NAMA had "too many chiefs and not enough Indians" and Mathews' alleged reorganization attempts. However, considering all relevant evidence, this does not demonstrate pretext. Gilland's promotion is consistent with Mathews' testimony that Mathews began looking into reorganizing his staff well before the pension underfunding became known. Gilland was also promoted from within NAMA and was performing the same work that he did following his promotion. In addition, Gilland's promotion required Gilland to report directly to Mathews and is consistent with Mathews' concerns regarding DeGrave's supervision of Gilland.

Furthermore, the evidence established that after DeGrave's termination, Gilland assumed most of DeGrave's responsibilities; and DeGrave's position was not filled by another employee.

DeGrave argues that Mathews' testimony supports DeGrave's claim of pretext because Mathews admitted reorganizing to address the 2003 operating deficit and that DeGrave's termination would have affected the pension underfunding. Mathews did testify that part of the reorganization efforts was to address the 2003 operating deficit; however, he also testified the reorganization efforts, including DeGrave's termination, were intended to address all budgetary concerns, which included the 2003 operating deficit, the pension underfunding, and cost savings generally. Mathews' testimony, considered in its entirety, does not support DeGrave's claim that Mathews' stated reasons for his termination were pretextual.

To the contrary, as discussed above, Mathews and Geerdes testified credibly that they did not know what effect DeGrave's termination would have on the pension underfunding and that the pension underfunding was not a consideration in the decision to terminate DeGrave's employment. The evidence, in total, demonstrates that DeGrave's employment was terminated because of his job performance and the need to cut costs in light of the budgetary concerns present in early 2004.

Based on the above, DeGrave has failed to provide sufficient evidence demonstrating that NAMA's proffered reasons were a pretext and that the motivating factor for his employment termination was the specific intent to interfere with his ERISA rights.

## **ORDER**

IT IS THEREFORE ORDERED that judgment be entered in favor of Defendant, the National Automatic Merchandising Association.

Date: January 19, 2007

JOHN W. DARRAH
United States District Court Judge